## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 1:13-CR-_12_- WLS** |
| | : | |
| **v.** | : | **VIOLATIONS:** |
| | : | **21 U.S.C. §§ 331(a) & 333(a)(2)** |
| **STEWART PARNELL,** | : | **18 U.S.C. § 1505** |
| **MICHAEL PARNELL,** | : | **18 U.S.C. § 1349** |
| **SAMUEL LIGHTSEY, and** | : | **18 U.S.C. § 1343** |
| **MARY WILKERSON,** | : | **18 U.S.C. § 1341** |
| **Defendants.** | : | **18 U.S.C. § 371** |
| | : | **18 U.S.C. § 2** |
| | : | |

### INDICTMENT

**THE GRAND JURY CHARGES:**

### GENERAL ALLEGATIONS

At times relevant to this Indictment:

1.  Peanut Corporation of America ("PCA") was a business incorporated in the State of Georgia that maintained places of business in Lynchburg, Virginia ("PCA Lynchburg"); Blakely, Georgia ("PCA Blakely"), which is located in the Albany Division of the Middle District of Georgia; Plainview, Texas ("PCA Plainview"); and Suffolk, Virginia ("PCA Suffolk").

2.  On or about February 15, 2001, a peanut production facility doing business as Casey's Food Products, Inc. in Blakely, Georgia, changed its name to Peanut Corporation of America, a business incorporated in Georgia, and defendant **STEWART PARNELL** of

Lynchburg, Virginia, became an owner and President of PCA.   PCA, a peanut processor and

manufacturer, was in the business of producing blanched peanuts, roasted peanuts, granulated (*i.e.*,

chopped) peanuts, peanut butter and peanut paste (collectively "peanut products") for sale to food

product manufacturers, pet food manufacturers, food service distributors and marketers and retail

outlets.   The food production was done at PCA Blakely, which produced roasted peanuts,

granulated peanuts, peanut butter, and peanut paste; PCA Plainview, which produced roasted

peanuts and granulated peanuts; and PCA Suffolk, which produced blanched peanuts.   PCA

Lynchburg was the company's headquarters, with offices operating out of the home of

**STEWART PARNELL**.   PCA was a legal entity that was engaged in, and whose activities

affected, interstate and foreign commerce.   In the last full fiscal year in which PCA did business

(October 2007 through September 2008), gross sales generated by PCA Blakely, PCA Suffolk,

and PCA Plainview totaled approximately $30 million.

3.       P.P. Sales, Inc. ("P.P. Sales") was a Lynchburg, Virginia, based business

incorporated in Virginia in or about May 2001, that provided the services of a food broker to

producers, manufacturers, and purchasers of food.   Food brokers are independent sales agents

who negotiate sales for producers, manufacturers, and purchasers of food.

**Defendants**

4.       **STEWART PARNELL** was an owner and President of PCA and served as PCA's

primary leader and decision maker.   **STEWART PARNELL** traveled to PCA Blakely, PCA

Plainview and PCA Suffolk to meet with plant management and employees and to supervise food

production.   **STEWART PARNELL** was familiar with all aspects of PCA's food production,

including blanching peanuts, roasting peanuts, granulating peanuts, and producing peanut butter

2

and peanut paste at all three PCA food production facilities.  **STEWART PARNELL** was a supervisor, advisor and director of PCA, giving direction to, and receiving reports regarding PCA's food production, manufacturing, microbiological testing and transportation, both directly and indirectly, from others, including:   Operations Manager Daniel Kilgore, Operations Manager **SAMUEL LIGHTSEY**, Office Manager/Quality Assurance Manager **MARY WILKERSON**, as well as other unindicted coconspirators (UCs), managers, and employees of PCA.

5.      **MICHAEL PARNELL** was the Vice President and principal decision maker of P.P. Sales.  **MICHAEL PARNELL**, the brother of **STEWART PARNELL**, worked on behalf of PCA as a food broker.  **MICHAEL PARNELL** oversaw the negotiation and execution of contracts for the purchase of peanut products from PCA, including contracts for the purchase of PCA peanut paste by Customer #1.  **MICHAEL PARNELL** was a supervisor, advisor and director of PCA, giving direction to and receiving reports regarding PCA's production, manufacturing, microbiological testing and transportation of peanut paste from others, including: **STEWART PARNELL, SAMUEL LIGHTSEY, MARY WILKERSON**, and Daniel Kilgore, as well as other unindicted coconspirators, managers, and employees of PCA.  **MICHAEL PARNELL** was frequently present at PCA Blakely, where Customer #1's peanut paste was produced and manufactured, managing and supervising the peanut paste production and the shipping by commercial carrier of the peanut paste to Customer #1's production facility in Cary, North Carolina.

6.      **SAMUEL LIGHTSEY** was the PCA Blakely Operations Manager from on or about July 2008 through February 2009.  **SAMUEL LIGHTSEY** was responsible for PCA Blakely plant operations, and he reported directly to and was directly supervised by **STEWART**

3

PARNELL.  **SAMUEL LIGHTSEY** supervised personnel and managed the production,

microbiological testing, packaging and transportation of food produced at PCA Blakely.

7.      **MARY WILKERSON** was employed in various capacities at PCA Blakely from

in or about April 2002 through February 2009.  **MARY WILKERSON** began work at PCA

Blakely as a receptionist.   She was eventually promoted to Office Manager, and later promoted to

Quality Assurance Manager, in or about March 2008.   As Quality Assurance Manager, she was

responsible for managing and overseeing the quality assurance operations at PCA Blakely.

**Others**

8.      Daniel Kilgore, not indicted herein, was the PCA Blakely Operations Manager

from on or about June 2002 through May 2008.   Daniel Kilgore was responsible for PCA Blakely

plant operations, and he reported directly to and was directly supervised by **STEWART**

**PARNELL**.   Daniel Kilgore supervised personnel and managed the production, microbiological

testing, packaging and transportation of food produced at PCA Blakely.

9.      Unindicted Coconspirator No. 1 ("UC #1") was the PCA Blakely Quality

Assurance Manager from on or about May 2003 through November 2007.   As Quality Assurance

Manager, he was responsible for managing and overseeing the quality assurance operations at

PCA Blakely.

10.     Unindicted Coconspirator No. 2 ("UC #2") was the PCA National Sales Manager,

based out of the PCA Lynchburg office, from in or about May 2005 through December 2008.

Prior to May 2005, UC #2 worked for PCA intermittently, assisting as needed from as early as

May 2003.   As National Sales Manager, he was responsible for the selling, planning, ordering,

merchandising and distribution of PCA food products from all PCA food production facilities.

4

11.     Unindicted Coconspirator No. 3 ("UC #3") was the PCA Blakely Production

Manager or interim Operations Manager from in or about February 2001 through November 2008.

As Production Manager, UC #3 was responsible for PCA Blakely food production operations and

he reported directly to and was supervised by the Operations Manager.   During June and July of

2008, UC #3 was the interim Operations Manager, where he was responsible for PCA Blakely

plant operations, and he reported directly to and was directly supervised by **STEWART**

**PARNELL**.

12.     Unindicted Coconspirator No. 4 ("UC #4") was the PCA Plainview Operations

Manager from on or about May 2007 through February 2009.   He was responsible for PCA

Plainview plant operations and he reported directly to and was directly supervised by **STEWART**

**PARNELL**.

**Customers**

13.     PCA sold peanut products to hundreds of customers.   Those customers ranged in

size from small, family-owned businesses, to global, multibillion-dollar food companies.   Among

those customers were the following:

> a)  Customer #1 was a multinational food products company with its principal
>
>     place of business in Battle Creek, Michigan.   Products purchased by Customer
>
>     #1 were shipped from PCA Blakely to a facility located in Cary, North
>
>     Carolina.
>
> b)  Customer #2 was a multinational manufacturer, seller and distributor of food
>
>     products containing peanuts with its principal place of business in Solon, Ohio.

5

Products purchased by Customer #2 were shipped from PCA Blakely to a facility located in Solon, Ohio.

c) Customer #3 was a national manufacturer, seller and distributor of dairy food products containing peanuts with its principal place of business in Lexington, Kentucky. Products purchased by Customer #3 were shipped from PCA Blakely to a facility located in Greensboro, Alabama.

d) Customer #4 was a national wholesale food distributor specializing in nuts, dried fruits, candy, chocolate, and snack mixes with its principal place of business in Hollywood, Florida. Products purchased by Customer #4 were shipped from PCA Blakely to a facility located in Hollywood, Florida.

e) Customer #5 was a national manufacturer, seller and distributor of dairy food products containing peanuts with its principal place of business in Dunkirk, New York. Products purchased by Customer #5 were shipped from PCA Blakely to a facility located in Dunkirk, New York.

f) Customer #6 was a national manufacturer, seller and distributor of food products containing peanuts with its principal place of business in Cincinnati, Ohio. Products purchased by Customer #6 were shipped from PCA Blakely to a facility located in Murray, Kentucky.

g) Customer #7 was a national wholesale and retail food distributor specializing in nut products, with its principal place of business in Cambridge, Massachusetts. Products purchased by Customer #7 were shipped from PCA Blakely to a facility located in Cambridge, Massachusetts.

6

h) Customer #8 was a national manufacturer of baked cookies containing peanuts with its principal place of business in Downers Grove, Illinois. Products purchased by Customer #8 were shipped from PCA Blakely to a facility located in Ogden, Utah and South Beloit, Illinois.

i) Customer #9 was a national food redistributor of food products, including peanuts, with its principal place of business in Mt. Sterling, Illinois. Products purchased by Customer #9 were shipped from PCA Blakely to a facility located in Mt. Sterling, Illinois.

j) Customer #10 was a national producer of peanut-coated caramel apples with its principal place of business in Washington, Missouri. Products purchased by Customer #10 were shipped from PCA Blakely to a facility located in Washington, Missouri.

k) Customer #11 was a national producer of specialty pet food containing peanut paste with its principal place of business in Battle Creek, Michigan. Products purchased by Customer #11 were shipped from PCA Blakely to a facility located in Ogden, Utah.

14. As a result of receiving from PCA adulterated and misbranded product and fraudulent paperwork associated with such product, PCA's customers incurred monetary losses.

**Peanut types**

15. There are four basic types of peanuts: Virginia, Runner, Spanish and Valencia. All four types of peanuts are grown in the United States. Various types of peanuts are also grown in countries worldwide, including China, Mexico and Argentina. The prices for peanuts are

7

based on a variety of factors, including peanut size and type. Peanuts, although commonly considered a "nut," are actually a legume, a type of bean plant. Unlike a true nut, which grows on trees, peanut plants produce a pod that grows on or in the ground. Within the pod is the "nut" that people commonly associate with peanuts.

**Peanut processing and production**

16.     Peanut blanching is the process whereby the peanut skin is removed, leaving the raw peanut for further processing, such as oil roasting or dry roasting. Because peanuts are grown on or in the ground, raw peanuts (i.e., peanuts that have not been roasted) may contain pathogenic bacteria, including salmonella. Proper roasting of raw peanuts at an adequate temperature and for an adequate amount of time is a critical stage in peanut processing. The sustained heat from the roaster operates as a "kill step" necessary to eradicate salmonella and other pathogenic bacteria that may be present on the peanuts. Dry roasting of peanuts is a process in which the raw peanuts are placed in an oven, usually on a conveyer belt, that travels through the oven, for a specific time at a specific temperature sufficient to cook the peanuts. Oil roasting of peanuts is a process in which the raw peanuts are placed in a container of hot oil for a specific time at a specific temperature sufficient to cook the peanuts.

17.     A peanut blanching facility, such as PCA Suffolk, will blanch the peanuts and then send the blanched raw peanuts to peanut roasting facilities. At peanut roasting facilities, such as PCA Blakely and PCA Plainview, the raw peanuts are roasted by either oil or dry roasting. After roasting, the peanuts may be left whole, or they may be processed into chopped peanuts of various sizes. The smallest size of chopped peanuts is called peanut meal, which is finely ground, roasted peanuts. To manufacture peanut paste, the roasted peanut meal is ground even further, until it

forms a paste.   Peanut paste can be further processed into peanut butter by adding other

ingredients, such as oil and salt (to make typical store-bought peanut butter) or chopped nuts (to

make crunchy peanut butter).   When no additional ingredients are added to peanut paste, it is

sometimes referred to as creamy natural peanut butter.   The peanut products are processed in

batches described as "lots," with an assigned number.

## Sanitary Peanut Product Production and Salmonella

18.     The safe production and manufacture of peanut products requires peanut producers

and manufacturers, such as PCA, to follow appropriate practices to ensure their production

facilities are sanitary and to prevent contamination by foodborne pathogens.   Salmonella is one

type of foodborne pathogen that peanut processors and manufacturers must prevent from being

present in their peanut products.   Some such appropriate practices include, but are not limited to:

a) No outside water, such as rain, which can transport salmonella and other
pathogens, should enter the facility;

b) the peanut roasting process must be validated to ensure that the time and
temperature combination will result in an adequate and predictable reduction of
target microorganisms, such as salmonella;

c) within the production facility, airflow should be controlled so that salmonella
and other pathogenic bacteria are not carried from raw peanut storage areas into
areas containing roasted peanuts;

d) rodents and insects, which can transport salmonella and other pathogens,
should be prevented from entering and remaining in the facility; and

9

e) a regular schedule for cleaning and sanitation should be implemented to prevent the growth of salmonella and other bacterial pathogens in all areas of the facility.

19.     Salmonella is a bacterium that can be present in, and introduced from, many sources, including water, soil, animals, animal feces, and insects.   People typically ingest salmonella through food.   When ingested, salmonella can cause a disease called salmonellosis. Salmonellosis is a bacterial infection of the intestinal tract, the symptoms of which include diarrhea, abdominal cramps, fever, chills, headache, nausea, and vomiting.   Salmonella infections can be life-threatening, especially for infants and young children, pregnant women and their unborn babies, older adults, and other persons with weakened immune systems.

**Testing for Foodborne Pathogens**

20.     Peanut processors and manufacturers can have their peanut products tested for the presence of foodborne pathogens, such as salmonella, in an effort to determine if their peanut products are safe for consumption by people.

21.     PCA officials represented to their customers that they tested their peanut products for salmonella and other foodborne pathogens.   PCA peanut product samples were sent to Laboratory #1, with a principal place of business in Albany, Georgia, and Laboratory #2, with a principal place of business in Lincolnshire, Illinois, for laboratory testing for the presence of foodborne pathogens.

22.     Laboratories test finished product samples for salmonella in the following manner: Upon receipt of a product sample from a peanut producer or manufacturer, the laboratory conducts testing of the sample and, within approximately 48 hours of receipt of the sample, the laboratory

reports to the peanut producer or manufacturer a result of either negative (*i.e.*, testing failed to detect salmonella) or "presumptive positive."   A presumptive positive result means that there is a possibility that salmonella is present in the sample, and further testing is required to confirm or refute the initial result.   The laboratory then conducts confirmational testing on the same sample, which takes two days longer.   The laboratory reports the confirmed result to the peanut producer or manufacturer.   If the laboratory testing results are a confirmed positive for salmonella, the peanut producer or manufacturer should then take corrective actions to determine the source of the salmonella and to eliminate it.   If the peanut product has already been shipped to the customer when the salmonella confirmed positive test results are received, the peanut producer or manufacturer must inform the customer in order to prevent salmonella contamination of the food supply and sickening people who consume the affected peanut products.

23.     A negative test result does not guarantee that the entire lot of product from which the sample was taken is free of salmonella, only that the portion of the sample tested is free of salmonella.   Testing screens only a small sampling of the total product manufactured.   Because salmonella is not homogeneous or pervasive throughout a food product, a sample taken from an uncontaminated portion of a production lot would not detect pockets of salmonella in the other portions of the same production.

24.     In addition to testing for salmonella, the laboratories also test for the presence of coliforms.   Coliforms are a type of bacteria commonly used as a bacterial indicator of the sanitary quality of foods.   While coliforms themselves are not normally the cause of serious illness, their presence is used to gauge whether other pathogenic organisms of fecal origin may be present. Fecal pathogens include bacteria, viruses, protozoa and many multicellular parasites.   A test

11

result showing high levels of coliforms is an indication that insanitary conditions may be present in the production facility.

## Customers' Product Specifications

25.     Many PCA customers required that the products they purchased meet certain product specifications (commonly referred to as "specs"). These specifications stated the acceptance criteria for the microbiological properties of the products they received. For example, some customers' specifications required that coliforms measured at less than 10 cfu/g[1]. Such microbiological specifications required that the products tested negative for salmonella. The specifications also addressed other requirements, such as the type and size of peanut to be used in the production of the products, the manner in which the products must be manufactured, labeled and packaged, and the chemical and physical properties of the products. PCA routinely issued Certificates of Analysis ("COAs") to its customers. These COAs certified that the products met the customer's specified testing requirements. For those customers that did not have written specifications, PCA maintained its own specifications for the products it manufactured and sold, and PCA represented to those customers that the products conformed to PCA's specifications.

## Guarantees of Food Quality

26.     PCA's customers relied on various representations by PCA about the purity of its product. Some customers required COAs from PCA that reported the results of microbiological testing of PCA's peanut products; these COAs certified that the particular production lot of peanut products had tested, among other things, negative for salmonella and within acceptable limits for coliforms. Customers were not given the actual test report that PCA received from the laboratory. Instead, PCA received the test results from Laboratories #1 and #2 and transferred the test results

---

[1] Colony-forming units per gram.

to a COA with PCA's letterhead.   PCA provided its COA to the customer by one of two methods:

(1) including the COA with the peanut product bill of lading, which accompanied the shipment; or

(2) sending the COA by fax or email.   Some customers required a Continuing Pure Food

Guarantee, in which PCA certified that "any articles shipped [to the customer] . . . were

manufactured in accordance with good manufacturing practice . . . and were free of any foreign

materials, or any substances which are poisonous, pathogenic, unlawful, toxic or in any way

injurious."   Apart from any written guarantees, all customers expected that PCA would provide

safe peanut products fit for consumption by people, and that it would not ship

salmonella-contaminated product or withhold information about salmonella contamination or high

coliform levels.

**FDA Inspection of PCA Blakely**

27.    In or about November 2008, various State Departments of Health, the United States

Centers for Disease Control and Prevention ("CDC"), and the United States Food and Drug

Administration ("FDA") began an investigation based on findings that peanut products in several

locations throughout the United States were contaminated with salmonella.   During the

investigation, it was determined that PCA Blakely was the likely source of salmonella

contamination in the peanut products.   On January 9, 2009, FDA inspectors arrived at PCA

Blakely to conduct an inspection of the premises, review documents, and interview PCA

employees, including **STEWART PARNELL**, **SAMUEL LIGHTSEY**, and **MARY**

**WILKERSON**, as authorized by the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C.

§ 301 et. seq.

## COUNT 1
### (Conspiracy: 18 U.S.C. § 1349)

Paragraphs 1-27 of this Indictment are hereby realleged and incorporated by reference as if set forth in full herein.   Beginning on or about a date prior to June 2003, the exact date being unknown to the Grand Jury, and continuing through on or about February 2009, in the Albany Division of the Middle District of Georgia, and elsewhere within the jurisdiction of the Court, the defendants,

**STEWART PARNELL,**
**MICHAEL PARNELL,**
**and**
**SAMUEL LIGHTSEY,**

did knowingly and willfully combine, conspire, confederate and agree with each other and with others both known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.      to knowingly and willfully devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing and attempting to execute that scheme, deposit and cause to be deposited matters and things to be sent and delivered by private and commercial interstate carriers, in violation of Title 18, United States Code, Section 1341; and

b.      to knowingly and willfully devise a scheme to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises, and for the purpose of executing that scheme, transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings,

14

signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## OBJECT OF THE CONSPIRACY

The object of the conspiracy was to defraud PCA's customers and to obtain money by means of false and fraudulent pretenses, representations and promises.

## MANNER AND MEANS OF THE CONSPIRACY

Among the manner and means by which the defendants and others conducted, participated, and assisted in the affairs of the business and the schemes to defraud were the following:

28.     It was part of the conspiracy that the defendants and others shipped and caused to be shipped peanut products before receiving the results of microbiological testing performed on said products.  Upon receipt of the results of said testing indicating that the products were confirmed positive for, and therefore contaminated and adulterated by, salmonella, or that the products otherwise were not within acceptable microbiological specifications, the defendants and others deceived their customers by failing to inform their customers of the test results, leading their customers to believe that the products they received were safe and within specifications, when in fact they were not.

29.     It was further part of the conspiracy that the defendants and others shipped and caused to be shipped peanut products after having received the results of microbiological testing performed on said products indicating that the products were confirmed positive for, and therefore contaminated and adulterated by, salmonella, or that the products otherwise were not within acceptable microbiological specifications.  The defendants and others deceived their customers by shipping said products with knowledge of said test results, and by failing to inform those

15

customers of said test results, leading their customers to believe that the products they received were safe and within specifications, when in fact they were not.

30.    It was further part of the conspiracy that the defendants and others, when shipping and causing to be shipped peanut products before receiving the results of microbiological testing performed on said products, sent and caused to be sent to their customers false and misleading COAs. Said COAs were false and misleading in that they contained microbiological test results from previously manufactured lots of peanut products, contained incomplete test results, or were otherwise false and fictitious. The defendants and others deceived their customers by leading them to believe that the results on the COA were from testing conducted on the products they received, when in fact they were not. The defendants and others deceived their customers by leading them to believe that the products they received were safe and within specifications, when in fact it had not yet been determined whether the products were safe and within specifications. Upon receipt of the results of the actual testing indicating that the products were confirmed positive for and therefore contaminated and adulterated by salmonella, or that the products otherwise were not within acceptable microbiological specifications, the defendants and others further deceived their customers by failing to inform their customers of the test results.

31.    It was further part of the conspiracy that the defendants and others shipped and caused to be shipped peanut products without ever submitting a sample from said lot for microbiological testing by a laboratory, despite customers' specifications requiring such testing. The defendants and others sent and caused to be sent to their customers false and misleading COAs. Said COAs were false and misleading in that they contained microbiological test results from previously manufactured lots of peanut products or were otherwise false and fictitious. The

16

defendants and others deceived their customers by leading them to believe that the results on the COA were complete results from testing conducted on the products they received, when in fact the products they received had never been, and never were, tested at all. The defendants and others further deceived their customers by leading them to believe that the products they received were safe and within microbiological specifications, when in fact it was unknown whether the products were safe and within microbiological specifications.

32. It was further part of the conspiracy that the defendants and others, upon learning that a particular lot of peanut products had tested confirmed positive for salmonella or was otherwise not within microbiological specifications, directed that the lot be retested, either by the same or a different laboratory. If the lot retested negative for salmonella and was otherwise within specifications, the defendants and others sent and caused to be sent to their customers COAs containing the results of the retest only. The defendants and others deceived their customers by failing to inform them that the lot had previously tested confirmed positive for salmonella. In explaining delays to their customers, the defendants and others provided a variety of misleading reasons. On at least one occasion a customer was informed that a delay in testing was caused by an "inconclusive" test result, when in truth and fact, the defendants and others knew that PCA had received a conclusive test result indicating that the lot was confirmed positive for salmonella.

33. It was further part of the conspiracy that the defendants and others made false statements to their customers about the presence of salmonella in the PCA Blakely plant environment and in the products manufactured at the PCA Blakely plant, claiming that there had never been even a trace of a salmonella problem, when, in truth and fact, salmonella had

17

previously been detected in the plant, and salmonella had been detected in the products

manufactured there on numerous occasions every year dating back to 2003.

34.     It was further a part of the conspiracy that the defendants and others shipped and

caused to be shipped peanut products to their customers, falsely representing to their customers

that the products had been manufactured at the plant from which they were shipped, when in fact

the products had been manufactured at a plant which had not been approved by the customers to be

a supplier of said products.   PCA shipped and caused to be shipped such products from

unapproved plants despite some of its customers' requirements that all manufacturing plants be

approved prior to accepting product from the plant.   These customers required such approval

because they wanted to ensure the quality of the plant from which they were to receive product,

and because they wanted to have the capability to trace the origins of their product, if needed.

35.     It was further a part of the conspiracy that the defendants and others, without their

customers' knowledge and consent, shipped and caused to be shipped peanut products different

from the peanut products ordered or specified by the customers, or which otherwise did not meet

the customer's specifications.   For example, a customer whose specifications required that its

product be made from peanuts grown in United States received substituted product made from

peanuts grown in a foreign country.

36.     It was further a part of the conspiracy that the defendants and others, without their

customers' knowledge and consent, shipped and caused to be shipped peanut products which had

previously been rejected because they did not meet the customers' specifications or were

otherwise of substandard quality.

18

37.     It was further part of the conspiracy that the defendants and others represented PCA in a company brochure to be "The Processor of the World's Finest Peanut Products," with "a remarkable Food-Safety record, developed in an environment committed to continuous training and state-of-the-art Food Safety techniques"; however, the defendants and others produced and caused to be produced peanut products under the following insanitary conditions, which they knew were conducive to salmonella contamination, including, but not limited to, the following:

      a)   Roof leaks were not adequately repaired;

      b)   Roasting conditions were never properly validated to ensure that the time and temperature combination was adequate to perform the necessary kill step for foodborne pathogens;

      c)   Adequate measures were not taken to prevent rodent and insect infestation;

      d)   Adequate measures were not taken to prevent possible cross contamination between raw and finished product after the roasting process; and

      e)   Proper cleaning and sanitation procedures were not followed.

Despite warnings from industry experts, the defendants and others continued to produce and caused to be produced peanut products under the above conditions.   The numerous tests which were confirmed positive for salmonella were consistent with these manufacturing conditions, but the defendants and others concealed those results from their customers, failed to correct the causes of the salmonella contamination, and continued manufacturing and selling their products under the same conditions.

38.     It was further part of the conspiracy that the defendants and others, with respect to Customer #1, purposefully devised and implemented product testing procedures which, when fully

19

implemented, the defendants and others knew would result in: (i) every shipment of product to Customer #1 being accompanied by a false and misleading COA; and (ii) the majority of the product shipped to Customer #1 never being submitted for microbiological testing at all.

a) The primary product purchased by Customer #1 was peanut paste, which is ground roasted peanuts produced in bulk quantity with no additives, also known as creamy natural peanut butter when produced in smaller quantities. Customer #1 used the paste as an ingredient in peanut butter crackers. The paste was shipped to Customer #1 in specialized tanker trucks owned by P.P. Sales. A tanker truck had a holding capacity of approximately 44,000 pounds of paste. PCA Blakely shipped to Customer #1 approximately two to three tanker truckloads of paste per week.

b) Customer #1 required that its paste meet certain microbiological specifications. Therefore, each lot of paste received by Customer #1 had to include a COA from PCA containing the results of the testing performed on that lot, and those results had to be within Customer #1's specifications or the lot would be rejected and sent back to PCA Blakely. Proper testing procedure required PCA to take a sample from the finished lot of paste, identify the sample by its lot number, and send that sample to a laboratory for the required testing, which took approximately two days to complete. Upon completion of testing, the lab issued a report containing the identifying sample number and the test results for that sample number. If the test results were within specifications, proper procedure required that PCA transfer the results from the lab report to its own COA, and then ship the tanker truckload of paste to Customer #1 accompanied by the COA.

20

c)  However, instead of following the procedure described in paragraph (b), above, the defendants and others, soon after acquiring Customer #1's business for peanut paste, shipped and caused to be shipped the peanut paste to Customer #1 as soon as it had been produced.   In order to meet the production demands of Customer #1, the defendants and others shipped and caused to be shipped the loads of paste either before the test results had been received or without even testing the loads at all, and each shipment included a false COA containing the test results from a previously manufactured lot of paste.

d)  The scheme also included taking several samples from the same lot of paste. However, these samples were not identified by the lot number of the load of paste from which they were taken and which was actually being shipped to Customer #1.   Instead, the samples were assigned numbers to correspond with lots to be produced in the near future. For example, four samples were taken from lot number 8028, which was shipped to Customer #1 on January 26, 2008.   These samples were sent to the lab identified as sample numbers 8032, 8036, 8037, and 8038.    A separate lab report was generated for each sample number.   Sample numbers 8032, 8037, and 8038 tested within specifications. Therefore, there were three "clean" reports already in hand from which to generate COAs for three upcoming lots of paste to be produced in the near future and to be identified as lot numbers 8032, 8037, and 8038.   Truckloads of peanut paste with those assigned lot numbers were in fact shipped to Customer #1 on January 31, February 4, and February 6, 2008.   In this manner, if anyone ever questioned the validity or accuracy of the COA issued to Customer #1, there would be a fraudulent corresponding laboratory report that could be produced to support it.   Sample number 8036 did not test within specifications.

21

It tested confirmed positive for salmonella. Therefore, the defendants and unindicted coconspirators simply did not assign that number to a future lot. They skipped that number in production. However, the actual lot from which sample 8036 was taken, lot 8028, which was contaminated with salmonella, had already been shipped to Customer #1. Defendants and others did not inform Customer #1 that the product it had received was contaminated with salmonella.

e) Sending several samples from the same lot increased the chances that at least one of those samples would test within specifications. Also, because one lot could generate several "clean" reports, many lots were never tested at all. Of the approximately 118 lots of peanut paste shipped to Customer #1 in 2008 and 2009, approximately 74, or 63%, were never tested.

f) It was further part of the conspiracy that the defendants and others shipped and caused to be shipped substituted product to Customer #1, without Customer #1's knowledge and consent. Customer #1's ingredient specifications required that the peanut paste be produced from peanuts grown in the United States. PCA had provided a written certification to Customer #1 which stated: "Peanut Corporation of America certifies that all products produced at this facility are grown in the USA unless customers require peanuts that have been produced from a different origin." Despite this requirement, the defendants and others bought Mexican peanut paste in bulk quantities from a company in Mexico. This company was not an approved manufacturing facility for Customer #1. The Mexican paste was blended into Customer #1's paste, which was manufactured at PCA Blakely, often times at a ratio of approximately 50%. Also, the defendants and others

22

often used peanuts grown in Argentina to produce peanut paste for Customer #1.   Of the approximately 118 lots of peanut paste shipped to Customer #1 during 2008 and 2009, approximately 81, or 69%, contained Mexican paste or paste made from Argentine peanuts.

All in violation of Title 18, United States Code, Sections 1349 and 2.

## COUNT 2
### (Conspiracy: 18 U.S.C. § 371)

Paragraphs 1-38 (General Allegations and Manner and Means) of this Indictment are hereby realleged and incorporated by reference as if set forth in full herein.     Beginning on or about a date prior to June 2003, the exact date being unknown to the Grand Jury, and continuing through on or about February 2009, in the Albany Division of the Middle District of Georgia, and elsewhere within the jurisdiction of the Court, the defendants,

**STEWART PARNELL,**
**MICHAEL PARNELL,**
**and**
**SAMUEL LIGHTSEY,**

did knowingly and willfully combine, conspire, confederate and agree with each other and with others both known and unknown to the Grand Jury, to commit offenses against the United States, that is, to introduce and deliver for introduction into interstate commerce, with intent to defraud and mislead, food that was adulterated and misbranded, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2);

The manner and means of said conspiracy are alleged in paragraphs 28-38 above and are hereby realleged and incorporated herein by reference as if set forth in full herein.

23

## OBJECT OF THE CONSPIRACY

The object of the conspiracy was to defraud PCA's customers and to obtain money by means of false and fraudulent pretenses, representations and promises.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects of the conspiracy, the conspirators committed the following overt acts, among others:

1.     On or about June 19, 2003, UC # 2, without the knowledge and consent of the customer[2], via fax, instructed Daniel Kilgore that "when shipping [to the customer], please substitute from now on . . . . Chinese Extra Large in place of Blanched Jumbo Runners."   UC #2 noted on the fax that his instructions were "per Stewart."

2.     On or about September 15, 2004, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #10 before receiving the results of microbiological laboratory testing conducted on said products.   On September 20, 2004, PCA received the results of said laboratory testing which indicated that the products were confirmed positive for salmonella.   Neither **STEWART PARNELL**, Daniel Kilgore, nor others notified Customer #10 that the products it had received had tested confirmed positive for salmonella.

3.     On or about June 29, 2005, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #9 before receiving the results of microbiological laboratory testing conducted on said products.   On July 5, 2005, PCA received the results of said laboratory testing which indicated that the products were confirmed positive for salmonella.   Neither **STEWART PARNELL**, Daniel Kilgore, nor others notified Customer #9 that the products it had received had tested confirmed positive for salmonella.

---

[2] Customers without an identifying number are customers of PCA other than those identified as Customers #1-11 above.

4.     On or about July 8, 2005, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #9 after having been notified on July 5, 2005, that said products had tested confirmed positive for salmonella, and without notifying Customer #9 of said test results.

5.     On or about July 15, 2005, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #9 after having been notified on July 5, 2005 that said products had tested confirmed positive for salmonella, and without notifying Customer #9 of said test results.

6.     On or about August 12, 2005, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #9 before receiving the results of microbiological laboratory testing conducted on said products.   On August 13, 2005, PCA received the results of said laboratory testing which indicated that the products were positive for salmonella.   Neither **STEWART PARNELL**, Daniel Kilgore, nor others notified Customer #9 that the products it had received had tested confirmed positive for salmonella.

7.     On or about a date prior to August 14, 2006, the exact date being unknown to the Grand Jury, **STEWART PARNELL** instructed the operations manager of PCA Plainview to fill a customer's order for 44,000 pounds of organic Valencia peanuts with 50% Valencia peanuts and 50% Spanish Peanuts.

8.     On or about September 7, 2006, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to a customer before receiving the results of microbiological laboratory testing conducted on said products.   Said shipment was accompanied

by a false COA which contained microbiological test results from a previously manufactured lot of peanut products.

9.      On or about September 18, 2006, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #2 before receiving the results of microbiological laboratory testing conducted on said products.   On September 21, 2006, PCA received the results of said laboratory testing which indicated that the products were confirmed positive for salmonella.   Neither **STEWART PARNELL**, Daniel Kilgore, nor others notified Customer #2 that the products it had received had tested confirmed positive for salmonella.

10.      On or about September 20, 2006, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #2 before receiving the results of microbiological laboratory testing conducted on said products.   On September 21, 2006, PCA received the results of said laboratory testing which indicated that the products were confirmed positive for salmonella.   Neither **STEWART PARNELL**, Daniel Kilgore, nor others notified Customer #2 that the products it had received had tested confirmed positive for salmonella.

11.      On October 5, 2006, after having been notified by a customer that the products it had received from PCA (from the September 7, 2006, shipment referenced in paragraph 8, above) had tested confirmed positive for salmonella, **STEWART PARNELL** falsely stated to said customer, via email: "I am dumbfounded by what you have found.   It is the first time in my over 26 years in the peanut business that I have ever seen any instance of this.   We run Certificates of Analysis EVERY DAY with tests for Salmonella and have not found any instances of any, even traces, of a Salmonella problem." (Emphasis in original).

26

12.     On November 16, 2006, in response to a question from **STEWART PARNELL** about another company's practices regarding issuing COAs to customers, **MICHAEL PARNELL** stated that PCA could provide fictitious COAs to its customers.   Via email to **STEWART PARNELL, MICHAEL PARNELL** stated: "Truthfully if a customer called and needed one [a COA] that was for say 2 pallets or so they [the company] would create one.   Most of the time smaller people will accept one produced with your company heading on it that looked professionally done.   The girl in TX was very good at white-out."   On or about November 16, 2006, **STEWART PARNELL** forwarded said email to Daniel Kilgore and instructed him "to track our COA costing over the next couple of months..."

13.     On or about March 2-3, 2007, **MICHAEL PARNELL** recommended and Daniel Kilgore directed that the operations manager of PCA Plainview "rebox" forty cases of product, which had been manufactured in Blakely, in packaging and labeling to make it appear to the customer that the product had been manufactured in Plainview.   **MICHAEL PARNELL** stated, via email: "I would recommend having Plainview rebox the product with a production label of Monday and a COA that shows the lot number that matches.   The COA would need to be dated on Tuesday or whatever to make sure everything shows Monday as a production date."    Daniel Kilgore forwarded said email to the operations manager of PCA Plainview, with the following instructions: "The product, forty cases, should be to you on Tuesday and will need to be 're-boxed' in your packaging with your labels."

14.     On or about March 8, 2007, via email to a customer, **STEWART PARNELL** falsely stated: "We still have in our possession retained samples of that lot [the lot of peanut products shipped on September 7, 2006, referenced in paragraph 8, above, which had tested

27

confirmed positive for salmonella during testing performed after delivery of the product to the customer] that we have run countless tests and show absolutely no evidence of Salmonella.   As well our Pathogen monitoring and 'Swab Testing'[3] in our plant has shown no evidence of any place Salmonella could have been introduced into our product."   In truth and fact, testing of returned and retained samples of said product indicated that the product was in fact confirmed positive for salmonella, and an environmental swab sample from inside PCA's plant had tested confirmed positive for salmonella.

15.     On or about March 14, 2007, via email to a customer, **STEWART PARNELL** falsely stated: "We have done and always have done very, very thorough testing on all peanuts, especially Organic, that we process for **any** customer of ours.   Every peanut that we have shipped has only left our facility upon successful negative testing for Salmonella and many other various micro testing procedures.   As well, we swab test our entire processing lines on a regular basis and this is audited by an outside . . . laboratory.   We can find absolutely no evidence of instances of Salmonella.   I have been in the peanut business for almost 30 years and as such have seen issues with Salmonella on raw peanuts but never, never in my experience have had a problem with this in a cooked peanut." (emphasis in original).

16.     On or about March 21, 2007, upon being told that salmonella testing results were not yet available and that shipment of a portion of a customer's product would therefore be delayed, **STEWART PARNELL** stated, via email: "shit, just ship it.   I cannot afford to loose [sic] another customer."

17.     On or about March 22, 2007, via email to a customer, **STEWART PARNELL** falsely stated: "We have done an extensive complete environmental swabbing as well as testing of

---

[3] "Swab testing," also referred to as "environmental testing," refers to the practice of wiping the surface areas in the production facility with swabs and testing the swabs for the presence of pathogens, including salmonella.

all our retained samples and as well absolutely EVERY product that leaves our facility is sampled by an extensive sampling procedure formulated by [Laboratory 1]. We have not found ANY instance of ANY micro issues in our facility or products at the point they leave our facility. We continue to monitor this constantly."

18.    On or about April 5, 2007, upon being told that salmonella testing results were not yet available and that shipment of a portion of a customer's order would therefore be delayed, and upon being asked whether "to short ship them again and wait for results or just ship," **STEWART PARNELL** instructed Daniel Kilgore, via email: "SHIP."

19.    On or about April 12, 2007, via email to UC #2, a PCA official suggested that totes of peanut meal at PCA Plainview be used to fill an order, noting that "[t]hey need to air hose the top off though because they are covered in dust and rat crap." UC #2 forwarded said email to **STEWART PARNELL**, who responded: "Clean em all up and ship them . . ." A PCA official then instructed PCA Plainview employees, via email: "PLEASE, PLEASE make sure someone air hoses off the totes before they are loaded on the truck. They are filthy on top."

20.    On or about April 23, 2007, UC #2, via email sent to PCA Plainview employees and copied to **STEWART PARNELL**, "recommend[ed]" that PCA Plainview employees "[u]se the MEDIUM VA'S for ALL outstanding JUMBO RUNNER orders in Plainview." The operations manager of PCA Plainview later in the email exchange responded that "VA Meds can't be sub'ed for JU Runners."

21.    On or about June 7, 2007, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #9 before receiving the results of microbiological laboratory testing conducted on said products. On June 13, 2007, PCA received

the results of said laboratory testing which indicated that the products were confirmed positive for salmonella. Neither **STEWART PARNELL**, Daniel Kilgore, nor others notified Customer #9 that the products it had received had tested confirmed positive for salmonella.

22.     On or about June 8, 2007, **STEWART PARNELL** and UC #4 issued and caused to be issued to a customer a false and misleading COA containing microbiological test results from a particular lot of peanut products manufactured prior to the lot of peanut products shipped to the customer. (The raw peanuts used in the production of the peanut products shipped to this customer had not yet been received at PCA Plainview on the date the laboratory issued the report upon which the false COA was based.).

23.     On or about June 13, 2007, **STEWART PARNELL** and UC #4 issued and caused to be issued to a customer a false and misleading COA containing microbiological test results from a particular lot of peanut products manufactured prior to the lot of peanut products shipped to the customer.

24.     On or about June 20, 2007, or sometime thereafter, **STEWART PARNELL** and UC #4 issued and caused to be issued to a customer a false and misleading COA containing microbiological test results from a particular lot of peanut products manufactured prior to the lot of peanut products shipped to the customer. (The raw peanuts used in the production of the peanut products shipped to this customer had not yet been received at PCA Plainview on the date the laboratory issued the report upon which the false COA was based.).

25.     On or about July 12, 2007, **STEWART PARNELL** and Daniel Kilgore shipped and caused to be shipped peanut products to Customer #6 before receiving the results of microbiological laboratory testing conducted on said products. On July 16, 2007, PCA received

30

the results of said testing from Laboratory #1, which indicated that the products were confirmed positive for salmonella. A second sample from the same lot was tested by Laboratory #1 and again tested confirmed positive for salmonella on July 18, 2007. Daniel Kilgore and UC #1 submitted and caused to be submitted a third sample from said lot to Laboratory #1 and a fourth sample from said lot to Laboratory #2. On July 20, 2007, PCA was notified that the fourth sample tested negative for salmonella (final results on the third sample had not yet been received). Neither **STEWART PARNELL**, Daniel Kilgore, nor others notified Customer #6 that the products it had received had twice tested confirmed positive for salmonella.

26.     On or about July 31, 2007, UC #4, via email, informed a PCA Plainview employee that a customer needed a COA for a prior order, and UC #4 did inquire of said employee: "Do we have anything we can use?"

27.     On or about August 16, 2007, **STEWART PARNELL** did inform **MICHAEL PARNELL**, Daniel Kilgore and UC #2 that **MICHAEL PARNELL** should have added oil to a customer's product without the customer's consent, because the customer likely would have refused consent but would have been unlikely to notice the change.  **STEWART PARNELL** stated, via email: "I would have just done that without asking and priced him accordingly.   Their Q.C. [quality control] will never figure that out....or allow that...it would change the 'taste profile'."

28.     On or about August 16, 2007, in discussing the possibility of PCA obtaining its own laboratory testing equipment, **STEWART PARNELL**, via email, stated to Daniel Kilgore, UC #1, and UC # 2: "these lab tests and COA's are fucking breaking me / us."

31

29.     On or about September 12, 2007, **STEWART PARNELL**, **MICHAEL**

**PARNELL**, and Daniel Kilgore shipped and caused to be shipped a particular lot of peanut paste

to Customer #1 without ever having submitted a sample from said lot for microbiological testing

by a laboratory.   Said shipment was accompanied by a false COA which contained

microbiological test results from a previously manufactured lot of peanut paste.

30.     On September 26, 2007, UC #1, via email, provided **MICHAEL PARNELL** with

an incomplete COA which he knew **MICHAEL PARNELL** would falsify, stating in said email:

"Mike, Here is the COA you need to fill out for Thursday's Load.   I won't get back the results in

time."   On or about September 29, 2007, Daniel Kilgore forwarded that same email to

**MICHAEL PARNELL**.   On or about September 29, 2007, **STEWART PARNELL**,

**MICHAEL PARNELL**, and Daniel Kilgore shipped and caused to be shipped to Customer #1 a

particular lot of peanut paste for which PCA had not yet received the results of microbiological

testing.   On or about September 29, 2007, **MICHAEL PARNELL** issued and caused to be issued

to Customer #1 a COA for said lot of peanut paste that contained false and fictitious

microbiological test results.

31.     On or about October 3, 2007, UC #1, via email, provided **MICHAEL PARNELL**

with an incomplete COA which he knew **MICHAEL PARNELL** would falsify, stating in said

email: "Mike, Please fill out.   Thanks.   Are you going to send???"   On or about October 3, 2007,

**STEWART PARNELL**, **MICHAEL PARNELL**, and Daniel Kilgore shipped and caused to be

shipped to Customer #1 a particular lot of peanut paste before receiving the results of

microbiological testing on said lot.   On or about October 3, 2007, **MICHAEL PARNELL** issued

and caused to be issued to Customer #1 a COA for said lot of peanut paste that contained false and

fictitious microbiological test results. Test results subsequently received by PCA indicated that the lot was not within Customer #1's specifications, as it was high in coliforms. Neither **STEWART PARNELL**, **MICHAEL PARNELL**, Daniel Kilgore, nor others informed Customer #1 that the product it had received did not meet its specifications.

32. On or about October 24, 2007, **STEWART PARNELL**, **MICHAEL PARNELL**, and Daniel Kilgore shipped and caused to be shipped a particular lot of peanut paste to Customer #1 without ever having submitted a sample from said lot to a laboratory for microbiological testing. Said shipment was accompanied by a false COA which contained microbiological test results from a previously manufactured lot of peanut paste.

33. On or about January 26, 2008, **STEWART PARNELL**, **MICHAEL PARNELL**, and Daniel Kilgore shipped and caused to be shipped to Customer #1 a particular lot of peanut paste before receiving the results of microbiological testing on said lot. Said shipment was accompanied by a false COA which contained microbiological test results from a previously manufactured lot of peanut paste. PCA subsequently received the results of microbiological testing on the lot shipped to the customer, which indicated that the lot was confirmed positive for salmonella. Neither **STEWART PARNELL**, **MICHAEL PARNELL**, Daniel Kilgore, nor any other PCA official informed Customer #1 that the product it had received had tested confirmed positive for salmonella.

34. On or about February 4, 2008, **STEWART PARNELL**, **MICHAEL PARNELL**, and Daniel Kilgore shipped and caused to be shipped to Customer #1 a particular lot of peanut paste before receiving the results of microbiological testing on said lot. Said shipment was accompanied by a false COA which contained microbiological test results from a previously

33

manufactured lot of peanut paste.   Test results subsequently received by PCA indicated that the lot was not within Customer #1's specifications, as it was high in coliforms.   Neither **STEWART PARNELL, MICHAEL PARNELL**, Daniel Kilgore, nor any other PCA official informed Customer #1 that the product it had received did not meet its specifications.   Said lot also contained, without the knowledge and consent of Customer #1, peanut paste which had been manufactured from over 32,000 pounds of peanuts which were grown in Argentina.

35.       On or about February 4, 2008, after referring to 1374 pounds of peanut products left over from production as "waste," **STEWART PARNELL** did state, via email to PCA employees, including Daniel Kilgore, **MARY WILKERSON**, UC #2, and UC #3, the following:   "I am not sure anyone down there quite understands how <u>SERIOUS</u> this is....these are not peanuts you are throwing away every day..IT **IS MONEY.....IT IS MONEY,....IT IS MONEY...IT IS GOD DAMN MONEY THAT WE DO NOT HAVE BECAUSE OF HOW LONG I HAVE ALLOWED you, your crew and everyone down there to let THIS GO ON**.................**The idea is Not to have to rework it............**NOT TO HAUL IT NEXT DOOR, PAY STORAGE, PAY TO REWORK IT AND THEN GIVE IT AWAY.. the idea is to STOP THE MONEY FROM BEING CARRIED OUT THE BACK DOOR IN THE FORM OF WILDLIFE / Oil Stock / CHARITY...... <u>STOP THE MONEY FROM EVER GETTING OUT OF THE PRODUCTION FLOW.......</u>!!!!!!!!!!" (emphasis and punctuation in original; font size reduced from original).

36.       On or about March 3, 2008, via email, **MICHAEL PARNELL** advised a PCA official needing a COA for a customer, "[w]e can then supply them with a generic COA or even a Customer #1 COA."

34

37.     On or about May 8, 2008, **STEWART PARNELL**, Daniel Kilgore, and UC #2 did discuss and agree, via email, to give false information to the FDA regarding the reason PCA's product had been rejected by a customer.   In said email exchange, they planned to falsely state to FDA officials that the product had been rejected because of size issues when in fact it had been rejected because it contained metal fragments.   Daniel Kilgore did state: "We all need to have our stories straight if and when we are questioned by the FDA.   I'm afraid that conflicting stories would only delay release and raise questions."   In response, **STEWART PARNELL** instructed that the explanation to be given to the FDA be "SIZE ISSUES OF THE CUT."   **STEWART PARNELL** further stated: "I don't want to mention metal . . . ."   UC #2 did prepare and circulate via email a letter on PCA letterhead stating that the product was rejected due to "improper size."

38.     On or about June 14, 2008, **STEWART PARNELL, MICHAEL PARNELL**, and UC #3 shipped and caused to be shipped to Customer #1 a particular lot of peanut paste before receiving the results of microbiological testing on said lot.   Said shipment was accompanied by a false COA which contained microbiological test results from a previously manufactured lot of peanut paste.   The lot was rejected by Customer #1 because it was not of proper viscosity (i.e., consistency), and the lot was returned to PCA Blakely.   On or about June 16, 2008, after adding oil to the paste, **STEWART PARNELL, MICHAEL PARNELL**, and UC #3 did ship and cause to be shipped to Customer #1 the same lot of paste which had been rejected by Customer #1, with a new lot number assigned and with another false COA, which contained microbiological test results from a previously manufactured lot of peanut paste.

39.     On or about June 18, 2008, **STEWART PARNELL, MICHAEL PARNELL**, and UC #3 shipped and caused to be shipped to Customer #1 a particular lot of peanut paste

without ever having submitted a sample from said lot to a laboratory for microbiological testing. Said shipment was accompanied by a false COA which contained microbiological test results from a previously manufactured lot of peanut paste.   Said lot also contained, without the knowledge and consent of Customer #1, over 20,000 pounds of peanut paste which had been manufactured in Mexico.   Neither **STEWART PARNELL**, **MICHAEL PARNELL**, **MARY WILKERSON**, UC #3, nor any other PCA official informed Customer #1 that the product was never tested, nor did they inform Customer #1 that the product contained Mexican peanut paste.

40.     On or about June 30, 2008**, MARY WILKERSON** did, via email, state to UC #4 that "we have a problem with the granulation line and salmonella at least every other week if not every week, but when retested by a different lab it comes back ok."

41.     On or about July 10, 2008, **MARY WILKERSON** did advise **SAMUEL LIGHTSEY**, via email, regarding PCA's practice of retesting, stating that "[UC #1] and [Daniel Kilgore] had always said to send Friday samples to [Laboratory #2].   They are the fall back lab when we do retest???   If the result from [Laboratory #1] came back to [sic] high we would pull another sample and send to [Laboratory #2] to compare the results and take the best between the two???"

42.     On or about July 21, 2008, in response to an inquiry from UC #2 about a customer's request for a COA, **MARY WILKERSON** stated, via email: "Waiting on retest! [The product] was out on Coliforms?????"   UC #2 responded to **MARY WILKERSON**, via email, stating: "Where do you think all this coliform positives are coming from?   Would you say it is the negative air pressure in the plant bringing in airborne pathogens?   Like over that rancid peanut butter along the fence?"   **MARY WILKERSON** responded to UC #2, stating: "MICE!"

43.     On or about August 7, 2008, **STEWART PARNELL**, **MICHAEL PARNELL**, and **SAMUEL LIGHTSEY** shipped and caused to be shipped to Customer #1 a particular lot of peanut paste before receiving the results of microbiological testing on said lot.   Said shipment was accompanied by a false COA which contained microbiological test results from a previously manufactured lot of peanut paste. Test results subsequently received by PCA indicated that the lot was not within Customer #1's specifications, as it was high in coliforms.   Said lot also contained, without the knowledge and consent of Customer #1, over 20,000 pounds of peanut paste which had been manufactured in Mexico.   Neither **STEWART PARNELL**, **MICHAEL PARNELL**, **SAMUEL LIGHTSEY**, **MARY WILKERSON**, nor any other PCA official informed Customer #1 that the product it had received did not meet its specifications.

44.     On or about August 21, 2008, upon being notified that product which had previously tested confirmed positive for salmonella had tested negative on a retest, **STEWART PARNELL** instructed **SAMUEL LIGHTSEY** to release said product.   **STEWART PARNELL** stated, via email: "okay, let's turn them loose then...Stewart."

45.     On August 25, 2008, UC #2, via email, advised brokers for a customer that shipment of its product would be delayed due to retesting at the laboratory because the initial test "was not conclusive" when in fact PCA had received conclusive test results indicating that the product did not meet the customer's specifications because it was high in coliforms.

46.     On August 26, 2008, UC #2, via email, advised a broker for Customer #2 that shipment of its product would be delayed due to retesting at the laboratory because "[f]or some reason one of the tests came back as inconclusive . . ." when in fact PCA had received conclusive

test results indicating that the product did not meet the customer's specifications because it was high in coliforms.

47.     On August 26, 2008, UC #2, via email, stated to **SAMUEL LIGHTSEY**: "Let [the broker referenced in paragraph (45) above] know one of the results from the COA on Customer #2 was 'inconclusive' and it would be Thursday on the earliest ship date..." (internal quotations in original).

48.     On September 29, 2008, UC #2, via email, advised a broker for Customer #5 to place a hold on product which PCA had shipped, informing him that "[we] have received an inconclusive test result from the lab that we are confirming and getting retested" and that "[m]ore definite results" would be expected later in the week, when in fact PCA had received conclusive test results indicating that the product was confirmed positive for salmonella.

49.     On September 29, 2008, UC #2, via email, advised a broker for another customer to place a hold on product which PCA had shipped, informing her that "[we] have received an inconclusive test result from the lab that we are confirming and getting retested" and that "[m]ore definite results" would be expected later in the week, when in fact PCA had received conclusive test results indicating that the product was confirmed positive for salmonella.

50.     On or about September 29, 2008, UC #2, via email, stated to **STEWART PARNELL** and **SAMUEL LIGHTSEY**: "Both customers [the customers referenced in paragraphs (46) and (47)] have been advised of the 'inconclusive' micro test and the pending retest to come back Thursday of this week." (internal quotation marks in original).

51.     On or about November 24, 2008, **STEWART PARNELL, MICHAEL PARNELL**, and **SAMUEL LIGHTSEY** shipped and caused to be shipped to Customer #1 a

particular lot of peanut paste before receiving the results of microbiological testing on said lot. Said shipment was accompanied by a false COA which contained microbiological test results from a previously manufactured lot of peanut paste. Test results subsequently received by PCA indicated that the lot was not within Customer #1's specifications, as it was high in coliforms. Said lot also contained, without the knowledge and consent of Customer #1, approximately 1700 pounds of peanut paste which had been manufactured in Mexico. Neither **STEWART PARNELL, MICHAEL PARNELL, SAMUEL LIGHTSEY, MARY WILKERSON**, nor any other PCA official informed Customer #1 that the product it had received did not meet its specifications.

52. On or about December 10, 2008, **STEWART PARNELL, MICHAEL PARNELL**, and **SAMUEL LIGHTSEY** shipped and caused to be shipped to Customer #1 a particular lot of peanut paste without ever having submitted a sample from said lot to a laboratory for microbiological testing. Said shipment was accompanied by a false COA which contained microbiological test results from a previously manufactured lot of peanut paste. During the production of said lot, **MARY WILKERSON** signed a "Bulk Tanker Peanut Butter Daily QA Worksheet," acknowledging that she had been advised by a PCA employee that rainwater was getting into the tank containing the product. Neither **STEWART PARNELL, MICHAEL PARNELL, SAMUEL LIGHTSEY, MARY WILKERSON**, nor any other PCA official informed Customer #1 that the product was never tested.

53. On or about December 31, 2008, **MARY WILKERSON** stated that dividing the plant into two separate areas to obtain two separate inspection audits would enable PCA to conceal problems from their customers, stating to **STEWART PARNELL** and **SAMUEL LIGHTSEY**,

via email: "Separating the Peanut Butter Room from the rest of the plant would give us a better chance at passing at least one or the other.   Hoping to pass both. . . . Having it separate was a good idea for peanut butter customer or roasting customers that require having a copy of our scores for their records.   And if they wanted a full report and there happen to be a problem with the plant area our butter customers wouldn't have to know that.   Especially [Customer #1]."

All in violation of Title 18, United States Code, Sections 371 and 2.

**COUNTS 3-22**
**(Introduction of Adulterated Food into**
**Interstate Commerce with Intent to Defraud or Mislead;**
**21 U.S.C. §§ 331(a) and 333(a)(2))**

Paragraphs 1-38 (General Allegations and Manner and Means) of this Indictment are hereby realleged and shall be incorporated by reference into each succeeding count of this Indictment as if set forth in full therein.

On or about the dates listed below, within the Albany Division of the Middle District of Georgia, and elsewhere within the jurisdiction of this Court, the named Defendants, aided and abetted by each other and by other persons known and unknown to the Grand Jury, with intent to defraud and mislead, did introduce and cause to be introduced into interstate commerce food, that is, peanut products, that was adulterated.

Said food was adulterated within the meaning of Title 21 United States Code, Section 342(a)(1) and (4) in that: (1) it contained a poisonous and deleterious substance, that is, salmonella, that may have rendered it injurious to health; and (2) it was prepared, packed and held under insanitary conditions whereby it may have become contaminated with filth and may have been rendered injurious to health.

| Ct. | Date | Defendants | Lot # | Carrier | Destination | Customer |
|---|---|---|---|---|---|---|
| 3 | 02/19/08 | S. PARNELL<br>M. PARNELL | 8044,<br>Peanut Paste | SouthernAG | North Carolina | 1 |
| 4 | 02/22/08 | S. PARNELL | 8024B,<br>Peanuts | R & L | Alabama | 3 |
| 5 | 02/27/08 | S. PARNELL | 8024B,<br>Peanuts | R & L | Florida | 4 |
| 6 | 03/05/08 | S. PARNELL<br>M. PARNELL | 8049,<br>Peanut Paste | SouthernAG | North Carolina | 1 |
| 7 | 03/28/08 | S. PARNELL<br>M. PARNELL | 8088,<br>Peanut Paste | SouthernAG | North Carolina | 1 |
| 8 | 04/22/08 | S. PARNELL<br>M. PARNELL | 8099,<br>Peanut Paste | SouthernAG | North Carolina | 1 |
| 9 | 05/21/08 | S. PARNELL<br>M. PARNELL | 8129,<br>Peanut Paste | SouthernAG | North Carolina | 1 |
| 10 | 05/27/08 | S. PARNELL<br>M. PARNELL | 8130,<br>Peanut Paste | SouthernAG | North Carolina | 1 |
| 11 | 06/27/08 | S. PARNELL | 8168,<br>Peanuts | DMX | New York | 5 |
| 12 | 06/27/08 | S. PARNELL | 8168,<br>Peanuts | Rudolph | Kentucky | 6 |
| 13 | 07/02/08 | S. PARNELL | 8168,<br>Peanuts | Roadway | Massachusetts | 7 |
| 14 | 07/14/08 | S. PARNELL<br>LIGHTSEY<br>M. PARNELL | 8184,<br>Peanut Paste | SouthernAG | North Carolina | 1 |
| 15 | 08/20/08 | S. PARNELL<br>LIGHTSEY<br>M. PARNELL | 8220,<br>Peanut Paste | SouthernAG | North Carolina | 1 |
| 16 | 08/29/08 | S. PARNELL<br>LIGHTSEY | 8226,<br>Peanut Butter | CBX | Utah | 8 |
| 17 | 09/25/08 | S. PARNELL<br>LIGHTSEY<br>M. PARNELL | 8263,<br>Peanut Paste | SouthernAG | North Carolina | 1 |

| 18 | 09/25/08 | S. PARNELL LIGHTSEY | 8268, Peanuts | Robert | New York | 5 |
| 19 | 11/24/08 | S. PARNELL LIGHTSEY M. PARNELL | 8308, Peanut Paste | SouthernAG | North Carolina | 1 |
| 20 | 12/03/08 | S. PARNELL LIGHTSEY M. PARNELL | 8310, Peanut Paste | SouthernAG | North Carolina | 1 |
| 21 | 12/10/08 | S. PARNELL LIGHTSEY M. PARNELL | 8344, Peanut Paste | SouthernAG | North Carolina | 1 |
| 22 | 1/06/09 | S. PARNELL LIGHTSEY | 8366, Peanut Paste | R & L | Utah | 11 |

All in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2), and Title 18, United States Code, Section 2.

## COUNTS 23-35
### (Introduction of Misbranded Food into Interstate Commerce with Intent to Defraud or Mislead; 21 U.S.C. §§ 331(a) and 333(a)(2))

Paragraphs 1-38 (General Allegations and Manner and Means) of this Indictment are hereby realleged and shall be incorporated by reference into each succeeding count of this Indictment as if set forth in full therein.

On or about the dates listed below, within the Albany Division of the Middle District of Georgia, and elsewhere within the jurisdiction of this Court, the named Defendants, aided and abetted by each other and by other persons known and unknown to the Grand Jury, with intent to defraud and mislead, did introduce and cause to be introduced into interstate commerce food, that is, peanut products, that was misbranded.   Said food was misbranded within the meaning of Title

21 United States Code, Section 343(a)(1) in that it was accompanied by a false and misleading certificate of analysis.

| Ct. | Date | Defendants | Lot no. | Carrier | Destination | Customer |
|---|---|---|---|---|---|---|
| 23 | 02/19/08 | **S. PARNELL M. PARNELL** | 8044, Peanut Paste | SouthernAG | North Carolina | 1 |
| 24 | 03/05/08 | **S. PARNELL M. PARNELL** | 8049, Peanut Paste | SouthernAG | North Carolina | 1 |
| 25 | 03/28/08 | **S. PARNELL M. PARNELL** | 8088, Peanut Paste | SouthernAG | North Carolina | 1 |
| 26 | 04/22/08 | **S. PARNELL M. PARNELL** | 8099, Peanut Paste | SouthernAG | North Carolina | 1 |
| 27 | 05/21/08 | **S. PARNELL M. PARNELL** | 8129, Peanut Paste | SouthernAG | North Carolina | 1 |
| 28 | 05/27/08 | **S. PARNELL M. PARNELL** | 8130, Peanut Paste | SouthernAG | North Carolina | 1 |
| 29 | 07/14/08 | **S. PARNELL LIGHTSEY M. PARNELL** | 8184, Peanut Paste | SouthernAG | North Carolina | 1 |
| 30 | 08/20/08 | **S. PARNELL LIGHTSEY M. PARNELL** | 8220, Peanut Paste | SouthernAG | North Carolina | 1 |
| 31 | 08/29/08 | **S. PARNELL LIGHTSEY** | 8226, Peanut Butter | CBX | Utah | 8 |
| 32 | 09/25/08 | **S. PARNELL LIGHTSEY M. PARNELL** | 8263, Peanut Paste | SouthernAG | North Carolina | 1 |
| 33 | 11/24/08 | **S. PARNELL LIGHTSEY M. PARNELL** | 8308, Peanut Paste | SouthernAG | North Carolina | 1 |

| 34 | 12/03/08 | S. PARNELL LIGHTSEY M. PARNELL | 8310, Peanut Paste | SouthernAG | North Carolina | 1 |
| 35 | 12/10/08 | S. PARNELL LIGHTSEY M. PARNELL | 8344, Peanut Paste | SouthernAG | North Carolina | 1 |

All in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2), and Title 18, United States Code, Section 2.

## COUNTS 36-55
## (Interstate Shipments Fraud: 18 U.S.C. § 1341)

Paragraphs 1-38 (General Allegations and Manner and Means) of this Indictment are hereby realleged and shall be incorporated by reference into each succeeding count of this Indictment as if set forth in full therein.

On or about the dates listed below, within the Albany Division of the Middle District of Georgia, and elsewhere within the jurisdiction of this Court, for the purpose of executing and attempting to execute the scheme to defraud, as more fully set forth above, the named Defendants, aided and abetted by each other and by other persons known and unknown to the Grand Jury, did deposit and cause to be deposited matters and things, to wit, bills of lading, COAs, and peanut products associated with the below lot numbers, to be sent and delivered by private and commercial interstate carrier:

| Ct | Date | Defendants | Lot no. | Carrier | Destination | Customer |
|----|------|-----------|---------|---------|-------------|----------|
| 36 | 02/19/08 | S. PARNELL M. PARNELL | 8044, Peanut Paste | SouthernAG | North Carolina | 1 |
| 37 | 02/22/08 | S. PARNELL | 8024B, Peanuts | R & L | Alabama | 3 |
| 38 | 02/27/08 | S. PARNELL | 8024B, Peanuts | R & L | Florida | 4 |

| 39 | 03/05/08 | **S. PARNELL** **M. PARNELL** | 8049, Peanut Paste | SouthernAG | North Carolina | 1 |
| 40 | 03/28/08 | **S. PARNELL** **M. PARNELL** | 8088, Peanut Paste | SouthernAG | North Carolina | 1 |
| 41 | 04/22/08 | **S. PARNELL** **M. PARNELL** | 8099, Peanut Paste | SouthernAG | North Carolina | 1 |
| 42 | 05/21/08 | **S. PARNELL** **M. PARNELL** | 8129, Peanut Paste | SouthernAG | North Carolina | 1 |
| 43 | 05/27/08 | **S. PARNELL** **M. PARNELL** | 8130, Peanut Paste | SouthernAG | North Carolina | 1 |
| 44 | 06/27/08 | **S. PARNELL** | 8168, Peanuts | DMX | New York | 5 |
| 45 | 06/27/08 | **S. PARNELL** | 8168, Peanuts | Rudolph | Kentucky | 6 |
| 46 | 07/02/08 | **S. PARNELL** | 8168, Peanuts | Roadway | Massachusetts | 7 |
| 47 | 07/14/08 | **S. PARNELL** **LIGHTSEY** **M. PARNELL** | 8184, Peanut Paste | SouthernAG | North Carolina | 1 |
| 48 | 08/20/08 | **S. PARNELL** **LIGHTSEY** **M. PARNELL** | 8220, Peanut Paste | SouthernAG | North Carolina | 1 |
| 49 | 08/29/08 | **S. PARNELL** **LIGHTSEY** | 8226, Peanut Butter | CBX | Utah | 8 |
| 50 | 09/25/08 | **S. PARNELL** **LIGHTSEY** **M. PARNELL** | 8263, Peanut Paste | SouthernAG | North Carolina | 1 |
| 51 | 09/25/08 | **S. PARNELL** **LIGHTSEY** | 8268, Peanuts | Robert | New York | 5 |
| 52 | 11/24/08 | **S. PARNELL** **LIGHTSEY** **M. PARNELL** | 8308, Peanut Paste | SouthernAG | North Carolina | 1 |
| 53 | 12/03/08 | **S. PARNELL** **LIGHTSEY** **M. PARNELL** | 8310, Peanut Paste | SouthernAG | North Carolina | 1 |

| 54 | 12/10/08 | S. PARNELL LIGHTSEY M. PARNELL | 8344, Peanut Paste | SouthernAG | North Carolina | 1 |
| 55 | 1/06/09 | S. PARNELL LIGHTSEY | 8366, Peanut Paste | R & L | Utah | 11 |

All in violation of Title 18, United States Code, Sections 1341.

## COUNTS 56-67
## (Wire Fraud: 18 U.S.C. § 1343)

Paragraphs 1-38 (General Allegations and Manner and Means) of this Indictment are hereby realleged and shall be incorporated by reference into each succeeding count of this Indictment as if set forth in full therein.

On or about the dates listed below, within the Albany Division of the Middle District of Georgia, and elsewhere within the jurisdiction of this Court, for the purpose of executing the scheme to defraud, as more fully set forth above, the named Defendants, aided and abetted by each other and by other persons known and unknown to the Grand Jury, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds; that is interstate wire communications between Georgia and other states on or about the dates as set forth below:

| Ct | Date | Defendant(s) | Description |
|----|------|--------------|-------------|
| 56 | 03/06/08 | S. PARNELL M. PARNELL | Email exchange via the Internet, between locations in Georgia and Virginia, attaching COA for previous load of peanut paste, in which Kilgore advises M. PARNELL: "please notice the lot numbers don't match.......if YOU want to change them, then please do so and then forward to [Customer #1]." |

46

| 57 | 03/06/08 | **S. PARNELL** | Email via the Internet, between locations in Georgia and Virginia, in which **KILGORE** suggests to **S. PARNELL** that PCA remain current on payments for Mexican peanut paste, as PCA was "averaging 2-3 loads a week to [Customer #1] and mixing [Mexican] paste in at 50%." |
| 58 | 03/07/08 | **S. PARNELL**<br>**M. PARNELL** | Email exchange via the Internet, between locations in Georgia and Virginia, in which **KILGORE** advises **M. PARNELL**: "You have the COA I sent the other day.....Please fill out what you want and sent [sic] back." |
| 59 | 03/26/08 | **S. PARNELL**<br>**M. PARNELL** | Email exchange via the Internet, between locations in Georgia and Virginia, discussing costs of laboratory testing for peanut paste sold to [Customer #1], in which Kilgore suggests to **S. PARNELL** and **M. PARNELL** that PCA could use a smaller sample size "and hope they don't ever catch it," and recommends that PCA no longer request expedited testing, which was "pointless because the samples don't ever match the loads anyway." |
| 60 | 05/08/08 | **S. PARNELL** | Email exchange via the Internet, between locations in Georgia and Virginia, in which Kilgore suggests **to S. PARNELL** and UC #2 that PCA officials should falsely state to FDA that PCA's product had been rejected by a customer because of size issues when in fact the product had been rejected because it contained metal fragments, stating: "We all need to have our stories straight if and when we are questioned by the FDA." |
| 61 | 06/02/08 | **M. PARNELL** | Email via the Internet, between locations in Georgia and Virginia, in which **M. PARNELL** suggests to a PCA employee in Blakely, Georgia, that PCA ship untested product with a COA from a different product. |
| 62 | 06/06/08 | **S. PARNELL** | Email exchange via the Internet, between locations in Georgia and Virginia, discussing retesting of product which had tested presumptive positive for salmonella, in which **S. PARNELL** states to PCA employees, including **WILKERSON**, UC#2, UC#3, and UC #4: "I go thru [sic] this about once a week...I will hold my breath...........again..." |

| 63 | 06/30/08 through 07/02/08 | **S. PARNELL** | Email exchange via the Internet, between locations in Georgia and Virginia, between **S. PARNELL, WILKERSON**, and UC #3, discussing the possibility of using peanut paste which "tastes like shit" to blend in with peanut paste sold to Customer #1. |
| --- | --- | --- | --- |
| 64 | 08/19/08 through 08/21/08 | **S. PARNELL LIGHTSEY** | Email exchange via the Internet, between locations in Georgia and Virginia, in which **S. PARNELL**, upon being advised that product, which had initially tested confirmed positive for salmonella, had subsequently retested negative, states to **LIGHTSEY**: "okay, let's turn them loose then." |
| 65 | 09/02/08 | **S. PARNELL LIGHTSEY** | Email exchange via the Internet, between locations in Georgia and Virginia, in which **S. PARNELL** authorizes **LIGHTSEY** to ship product which had not tested within acceptable microbiological specifications, because that customer did not require a COA. |
| 66 | 09/29/08 | **S. PARNELL LIGHTSEY** | Email exchange via the Internet, between locations in Georgia and Virginia, in which UC #2 informs **S. PARNELL** and **LIGHTSEY** that PCA "customers have been advised of the 'inconclusive' micro test and the pending retest to come back Thursday of this week," (internal quotation marks in original) when in fact PCA had received conclusive test results indicating that the products shipped to those customers were confirmed positive for salmonella. |
| 67 | 10/21/08 through 10/22/08 | **S. PARNELL LIGHTSEY M. PARNELL** | Email exchange via the Internet, between locations in Georgia and Virginia, in which **S. PARNELL** advises **LIGHTSEY, M. PARNELL**, and UC #2 that PCA should be able to change Mexican peanut paste specifications in order to match new color specifications for Customer #1. |

All in violation of Title 18, United States Code, Sections 1343.

## Counts 68-76
### (Obstruction of Justice; 18 U.S.C. § 1505)

Paragraphs 1-38 (General Allegations and Manner and Means) of this Indictment are

hereby realleged and shall be incorporated by reference into each succeeding count of this

Indictment as if set forth in full therein.

On or about the dates listed below, within the Albany Division of the Middle District of

Georgia, and elsewhere within the jurisdiction of this Court, the named Defendants, aided and

abetted by each other and by other persons known and unknown to the Grand Jury, by the actions

described below, corruptly obstructed, influenced and impeded, and endeavored to obstruct,

influence and impede, the due and proper administration of the law under which a pending

proceeding was being had before an agency of the United States, to wit, an inspection of the FDA

of PCA's facility in Blakely, Georgia, pursuant to the FDA's statutory inspection authority set

forth in Title 21, United States Code, Section 374;

| Ct. | Date | Defendant(s) | Act of Obstruction |
|-----|------|--------------|--------------------|
| 68 | 01/09/09 | **LIGHTSEY S. PARNELL** | On the first day of the inspection, when asked by the FDA Inspector, if PCA had received any positive results for salmonella, **LIGHTSEY** did state to the FDA Inspector: "We had one presumptive positive for salmonella in 5 lb. Pails of [Customer #2] Peanut Butter under lot # 8330 tested by [Laboratory #2], but it was found negative when the tests were completed."  **S. PARNELL** participated in this conversation by speaker phone and failed to correct **LIGHTSEY**'s statement. |
| 69 | 01/09/09 | **LIGHTSEY** | When asked by the FDA Inspector what products were tested for microbial analysis, **LIGHTSEY** stated the FDA Inspector that PCA collects a sample from all production lines to be tested for microbiological analysis. |

49

| 70 | 01/09/09 | **LIGHTSEY** | **LIGHTSEY** stated to the FDA Inspector that finished product is on hold at PCA until the test results are received from the private lab, which is usually about 4 days, and that once they have received results from the lab, the product is then shipped out. |
|----|----------|--------------|---|
| 71 | 01/12/09 | **LIGHTSEY** | **LIGHTSEY** stated to the FDA Inspector that the procedure for testing peanut paste, collecting approximately 4-5 samples from the bulk tank spout at one time, was done because of the large volume of paste in the 20,000 lb. holding bin. |
| 72 | 01/16/09 | **S. PARNELL** | During a conversation in which **S. PARNELL** participated by speaker phone, after being asked by the FDA Inspector if he remembered any more positives during 2008, S. PARNELL stated: "This is not something that happens very often and I think I would remember something that came up positive." **S. PARNELL** further stated that he had no knowledge of any. |
| 73 | 01/16/09 | **WILKERSON** | After **S. PARNELL** told the inspector that if any samples had come up positive, **WILKERSON** would know, but he had no knowledge of any, the FDA Inspector asked **WILKERSON** if she had any knowledge of any positives.   **WILKERSON** said to the FDA Inspector that earlier in the year she was not working in QA and that she was not aware of any positives. |
| 74 | 01/16/09 | **LIGHTSEY** | After being told by the FDA Inspector that the method of sample identification for peanut paste was confusing, **LIGHTSEY** stated to the FDA Inspector that in hindsight they realized that this was a poor system of designation. |
| 75 | 01/20/09 | **LIGHTSEY** | **LIGHTSEY** stated to the FDA Inspector that all products are tested for micro analysis except for the raw peanuts, and that they had not received a positive salmonella result for the roasted peanuts. |
| 76 | 01/24/09 | **LIGHTSEY** **WILKERSON** | **LIGHTSEY** and **WILKERSON** concealed and withheld from the FDA a record, that being a log entitled, "C.O.A. REQUESTS," which listed the sample numbers of all samples of peanuts products submitted for microbiological testing during calendar year 2008. |

All in violation of Title 18, United States Code, Sections 1505 and 2.

**Forfeiture: 18 U.S.C § 982(a)(4) and 28 U.S.C § 2461(c)**

Paragraphs 1-38 (General Allegations and Manner and Means) and paragraphs 1-53 (Overt Acts) of this Indictment are hereby realleged and shall be incorporated by reference into each succeeding count of this Indictment as if set forth in full therein.

The allegations contained in Counts 1 through 76 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(4) and Title 28, United States Code, Section 2461(c).

Pursuant to Title 18, United States Code, Section 982(a)(4) and Title 28, United States Code, Section 2461(c), upon conviction of a conspiracy to violate Title 18, United States Code, Sections 1341 and 1343, in violation of Title 18, United States Code, Section 1349 set forth in Count 1; conviction of the offense(s) in violation of Title 18, United States Code, Section 1341 set forth in Counts 36 through 55; conviction of the offense(s) in violation of Title 18, United States Code, Section 1343 set forth in Counts 56 through 67; the defendants, **STEWART PARNELL**, **MIKE PARNELL**, **DANIEL KILGORE**, **SAMUEL LIGHTSEY**, and **MARY WILKERSON** shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses.

3.      If any of the forfeitable property, real or personal, as a result of any act or omission of the defendants:

        a)   cannot be located upon the exercise of due diligence;

        b)   has been transferred or sold to, or deposited with, a third party;

        c)   has been placed beyond the jurisdiction of the court;

        d)   has been substantially diminished in value; or

e) has been commingled with other property which cannot be divided without

difficulty, the United States of America shall be entitled to forfeiture of

substitute property pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(4) and 28 U.S.C. § 2461(c).

A TRUE BILL.

/s/ Foreperson of the Grand Jury
FOREPERSON OF THE GRAND JURY

ON BEHALF OF THE UNITED STATES,

MICHAEL BLUME, Director
Consumer Protection Branch
United States Department of Justice

MICHAEL J. MOORE, United States Attorney
United States Attorney's Office
Middle District of Georgia

By: _____
PATRICK H. HEARN
Trial Attorney
Consumer Protection Branch
United States Department of Justice

By: _____
K. ALAN DASHER
Assistant United States Attorney
United States Attorney's Office
Middle District of Georgia

_____
MARY M. ENGLEHART
Trial Attorney
Consumer Protection Branch
United States Department of Justice

Filed in open court this 15 day of February , 2013.

_____
Deputy Clerk

52